**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 28, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos. 2025AP754-CR
2025AP755-CR**

Cir. Ct. Nos. 2024CM342
2024CF838

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

 PLAINTIFF-RESPONDENT,

 V.

S. J. S.,

 DEFENDANT-APPELLANT.

 APPEALS from orders of the circuit court for Brown County: JOHN P. ZAKOWSKI, Judge. *Reversed.*

 Before Stark, P.J., Hruz, and Gill, JJ.

¶1 STARK, P.J. In these consolidated cases, Scott[1] appeals from circuit court orders authorizing him to be involuntarily administered medication for the purpose of restoring him to competency so that he may stand trial in two criminal cases. *See* WIS. STAT. § 971.14. On appeal, Scott argues that the State failed to establish, under the first factor in *Sell v. United States*, 539 U.S. 166, 180 (2003), that the State has an important interest in proceeding to trial on the charges against him. The State argues that we should dismiss these appeals as moot because Scott's orders of commitment for treatment and for involuntary administration of medication have expired.

¶2 Although the parties agree that these cases are moot, we conclude that one or more exceptions to the mootness doctrine apply, and we will reach the merits. We further conclude that the State has failed to satisfy the first *Sell* factor because Scott has not been charged with a serious crime and special circumstances exist that mitigate the importance of the State's interest in bringing Scott to trial. Accordingly, we reverse the circuit court's orders for involuntary administration of medication.

## BACKGROUND

¶3 There is no dispute that Scott is mentally ill and that his illness has led to repeated hospitalizations for treatment and for restoration to competency since 1996. As relevant here, on March 22, 2024, Scott was charged in Brown

---

[1] For ease of reading, we refer to the appellant in these confidential matters using a pseudonym, rather than his initials. *See* WIS. STAT. RULE 809.109(6) (2023-24). We use the same pseudonym utilized by the appellant in his briefing before this court.

All references to the Wisconsin Statutes are to the 2023-24 version.

County Case No. 2024CM342 with disorderly conduct and obstructing an officer. Then, on May 4, 2024, Scott was arrested and later charged with possession of methamphetamine, disorderly conduct, obstructing an officer, misdemeanor bail jumping, and possession of drug paraphernalia in Brown County Case No. 2024CF838. Possession of methamphetamine is a Class I felony, and disorderly conduct, resisting an officer, bail jumping, and possession of drug paraphernalia are all misdemeanors. We discuss the circumstances of these charges in more detail below.

¶4 At Scott's initial appearance in Case No. 2024CF838, defense counsel raised concerns about Scott's competency. The circuit court ordered a competency examination, and Scott was found not competent. The court then entered orders of commitment for treatment in both cases on July 19, 2024.[2] However, it was not until November 21, 2024, that Scott was admitted to Mendota Mental Health Institute (MMHI) for competency treatment.

¶5 On January 13, 2025, the State moved for an involuntary medication order to restore Scott to competency based on the report and treatment plan of Dr. Angela Janis, which was attached to the motion. According to that report, Scott had been diagnosed with schizophrenia, amphetamine use disorder, and chronic left shoulder pain, and Janis explained that Scott was refusing all offered mental health medications. Janis further reported that Scott suffered from "significant grandiose and paranoid delusions" and that he "repeatedly stated that

---

[2] According to the record, Scott had previously been hospitalized for competency treatment in 2016, 2021, and 2023. The charges resulting in his competency commitment in 2021 and 2023 were ultimately dismissed.

3

he is prescribed methamphetamine and 'dopacocamine'"—a medication that does not exist—by another doctor.

¶6 The circuit court held an evidentiary hearing on the State's motion, at which Janis testified. Janis, who had been Scott's treating psychiatrist at MMHI, testified about Scott's mental illness, his need for treatment, and the specific treatment plan she had prepared for him. Janis explained that she would prescribe Scott the medication Abilify because Scott "has a personal history of taking that and appeared to tolerate it fairly well" compared to other medications he has tried.

¶7 The circuit court then heard arguments from the parties. Scott's defense counsel argued that the State had not met its burden to show an important governmental interest in prosecuting Scott because his crimes were not serious and were nonviolent and because the State's interest in prosecuting Scott was diminished based on the amount of time that had elapsed between the court's commitment orders and Scott's transfer to MMHI—a total of four months.

¶8 The State responded that it had met its burden under *Sell*. As relevant here, the State argued that Scott's crimes are serious because there is a significant public interest in enforcing the laws that criminalize the possession of methamphetamine, which "is a crime that creates danger within the community for a number of different reasons." In response to defense counsel's argument regarding Scott's treatment delay, the State explained that Scott was not transferred to MMHI sooner because there was a lack of bed space.

¶9 Ultimately, the circuit court concluded that the State had met its burden to prove each of the *Sell* factors. Thereafter, on February 3, 2025, the

4

court entered written orders for involuntary medication in both cases. Scott appeals.[3]

## DISCUSSION

¶10 "Rooted in the Fourteenth Amendment's Due Process Clause, the United States Supreme Court has identified 'a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs.'" *State v. J.D.B.*, 2026 WI 5, ¶8, 419 Wis. 2d 383, 31 N.W.3d 314 (citation omitted). However, this liberty interest may be overcome if the State has a competing "essential" or "overriding" interest. *Sell*, 539 U.S. at 178-79 (citation omitted). Accordingly, the government is constitutionally permitted to involuntarily administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges only "if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." *Id.* at 179.

¶11 These requirements comprise the Supreme Court's *Sell* factors. *See J.D.B.*, 419 Wis. 2d 383, ¶9. Our supreme court has adopted the *Sell* factors

---

[3] After Scott filed his notices of appeal in these cases, we granted his motion to stay the involuntary administration of medication orders pending disposition of these appeals on April 23, 2025. We also granted Scott's motion to consolidate these appeals on June 13, 2025. Ultimately, following a competency hearing on June 12, 2025, both criminal cases against Scott were dismissed by the circuit court.

Then, on June 30, 2025, Scott moved to stay these appeals pending our supreme court's decision in *State v. J.D.B.*, 2026 WI 5, 419 Wis. 2d 383, 31 N.W.3d 314, and we granted that motion. *J.D.B.* was released on February 25, 2026, we lifted the stay of these appeals on March 23, 2026, and briefing before this court was completed on July 3, 2026.

as the standard under WIS. STAT. § 971.14 to restore trial competency, which the State must establish by clear and convincing evidence. *See* ***State v. Fitzgerald***, 2019 WI 69, ¶2, 387 Wis. 2d 384, 929 N.W.2d 165; ***State v. Green***, 2021 WI App 18, ¶16, 396 Wis. 2d 658, 957 N.W.2d 583, *aff'd in part*, 2022 WI 30, 401 Wis. 2d 542, 973 N.W.2d 770, *and overruled on other grounds by*, ***J.D.B.***, 419 Wis. 2d 383, ¶33. The four ***Sell*** factors are as follows: (1) the State has an important interest in proceeding to trial; (2) involuntary medication will significantly further that interest; (3) involuntary medication is necessary to further that interest; and (4) involuntary medication is medically appropriate. ***Sell***, 539 U.S. at 180-81.[4] It is permissible to involuntarily administer medication to a defendant if each factor is satisfied. ***Green***, 396 Wis. 2d 658, ¶16.

## I. Mootness

¶12     The State argues that a threshold issue is whether these appeals are moot. Mootness is a question of law that we review de novo. ***PRN Assocs. v. DOA***, 2009 WI 53, ¶25, 317 Wis. 2d 656, 766 N.W.2d 559. "An issue is moot when its resolution will have no practical effect on the underlying controversy." ***Id.*** "As a general matter, we decline to reach moot issues." *See* ***Fitzgerald***, 387 Wis. 2d 384, ¶21. Our supreme court has stated previously that when a defendant is no longer subject to the medication order he or she challenges, "the issues presented in reviewing that order are moot." ***Id.***

> We may, however, decide an otherwise moot issue if it
> fits under one of the following exceptions: (1) "the issues

---

[4] The State also has statutory requirements that it must meet under WIS. STAT. § 971.14(3)(dm). Because those statutory requirements are not at issue in these cases, we do not address them further.

are of great public importance;" (2) "the constitutionality of a statute is involved;" (3) the situation arises so often "a definitive decision is essential to guide the trial courts;" (4) "the issue is likely to arise again and should be resolved by the court to avoid uncertainty;" or (5) the issue is "capable and likely of repetition and yet evades review because the appellate process usually cannot be completed and frequently cannot even be undertaken within a time that would result in a practical effect upon the parties."

*Id.*, ¶22 (citations omitted).

¶13    According to the State, the "stayed order[s] for involuntary medication ha[ve] expired because the order[s] of commitment ha[ve] expired," and, for that reason, we should dismiss these cases as moot. For his part, Scott agrees "that th[ese] appeal[s are] moot because the involuntary medication order[s are] expired and [he] was never medicated." *See J.D.B.*, 419 Wis. 2d 383, ¶11 n.2. Nevertheless, Scott argues that we should reach the merits of these cases because the issue "meets nearly every recognized exception to the mootness doctrine."

¶14    We choose to address the merits of these cases because we agree with Scott that multiple exceptions to the mootness doctrine apply. To begin with, it is undisputed that an individual's significant liberty interest in avoiding forced medication is "of great public importance." *See Fitzgerald*, 387 Wis. 2d 384, ¶22 (citation omitted); *Sell*, 539 U.S. at 176 ("[I]nvoluntary medical treatment raises questions of clear constitutional importance.").

¶15    Further, involuntary administration of medication orders under WIS. STAT. § 971.14 "arise[] often enough to warrant a definitive decision in order to guide the circuit courts regarding the constitutional standard for ordering involuntary medication to restore a defendant's competency to proceed." *Fitzgerald*, 387 Wis. 2d 384, ¶22. Although the State argues that two recent cases

provide guidance to circuit courts on the first *Sell* factor,[5] we conclude that there is a lack of significant guidance on how circuit courts are to evaluate whether an offense is serious and whether the State has an important interest in proceeding to trial.

¶16 Finally, even considering the new procedural rules designed to expedite review of orders under WIS. STAT. § 971.14, *see* WIS. STAT. RULE 809.109, the appellate process can easily outlast the underlying order, *see J.D.B.*, 419 Wis. 2d 383, ¶11 n.2. As Scott argues, and we agree, "[g]iven the timeline involved, there are no circumstances under which this appeal would be decided before the involuntary medication order expired." We consider this factor very important because in a case where the crime(s) is not likely to be deemed

---

[5] The State argues that this court's decisions in *State v. B.M.T.*, 2025 WI App 77, 419 Wis. 2d 330, 30 N.W.3d 516, and *State v. T.A.W.*, No. 2025AP437-CR, unpublished slip op., ¶19 (WI App June 3, 2025), "provide[] sufficient instruction on this issue," and "[t]here is no need to overlook mootness in [these cases] in order to reexamine what constitutes a 'serious crime.'"

We disagree with the State. Neither case purported to define what constitutes a serious crime and what factors a circuit court should consider under the first factor of *Sell v. United States*, 539 U.S. 166, 180 (2003), such that the cases clearly answer the question presented here. Further, the facts in Scott's cases are materially different from the facts in either of those cases. For example, in *B.M.T.*, which also involved the involuntary administration of medication to restore competency, the defendant argued that the first *Sell* factor had not been met because only 2 of his 20 criminal charges were serious. *See B.M.T.*, 419 Wis. 2d 330, ¶¶1-2, 8. We explained that "the State's interest extends not merely to the two conceded 'serious crimes' of battery, but to the whole panoply of alleged criminal conduct." *Id.*, ¶36. In *T.A.W.*, also a WIS. STAT. § 971.14 case, the defendant was charged with resisting an officer causing soft tissue injury, a Class H felony, and misdemeanor retail theft. *T.A.W.*, No. 2025AP437-CR, ¶¶1-2. The State specifically cites *T.A.W.* for the statement, with which we agree, that "there is no requirement … that a crime *must* be listed in [a] statute defining 'serious crime' … in order to qualify as a 'serious crime' under *Sell*." *Id.*, ¶19. Finally, we agree with Scott that *B.M.T.* and other cases do not "provide sufficient guidance for courts to answer the 'single unified question' of whether the government has a sufficiently important interest in prosecution when—like here—the parties dispute whether the state was prosecuting 'serious crimes' and the defendant" alleges mitigating circumstances.

serious, the person detained will likely have completed his or her sentence before a challenge to an involuntary medication order to restore that individual to competency is ever brought before an appellate court. Thus, we recognize the need to address this legal issue of statewide importance that would evade review with strict application of the mootness doctrine.

## II. *Sell* **factors**

¶17 As we stated above, the first *Sell* factor is the only factor in dispute in these cases, with Scott asserting that the State failed to meet its burden to prove by clear and convincing evidence that it has an important governmental interest in prosecuting him. In contrast, the State argues that the circuit court properly concluded that the State has an important governmental interest because Scott's crimes were serious.

¶18 Under the first *Sell* factor, the circuit court is required to "find that *important* governmental interests are at stake." *J.D.B.*, 419 Wis. 2d 383, ¶12 (quoting *Sell*, 539 U.S. at 180). "When someone is accused of a serious crime—whether against a person or property—bringing them to trial meets this threshold; it is an important governmental interest." *Id.*

¶19 "[E]ven if a serious crime is present," however, "'[s]pecial circumstances may lessen the importance of that interest' in a particular case." *Id.*, ¶13 (citation omitted). Nevertheless, "[t]he first *Sell* factor is not a two-part test; it is a single unified question." *Id.*, ¶14. "*Sell* asks whether the state has an important interest that is not sufficiently mitigated so as to become unimportant considering 'the facts of the individual case,'" but the inquiry is not "a checkbox of 'special circumstances' with fixed rules." *Id.* (citation omitted). "Again, the

question is whether the state has an interest in prosecution that is important enough to override the defendant's liberty interest against unwanted medication." *Id.* Whether the State has an important interest in prosecuting the accused is a question of law subject to our de novo review. *Id.*, ¶21.

¶20    In finding that Scott was charged with serious crimes, the circuit court engaged in the following discussion on the record:

> I just have to look at the facts of the case and determine if I think it's serious …. [S]omeone possessing methamphetamine, … the impact that it has on the individual and society makes it very serious. It's a serious crime. Full stop….
>
> ….
>
> So the Court finds that this crime is serious, such that there is an important governmental interest at stake. Now more than ever there's an important governmental interest in terms of protecting people from themselves with drug cases because it's more than just the person. The residual effects involve society.

When Scott's defense counsel sought to clarify whether the court was considering both the felony and misdemeanor cases, the court made the following statement: "Well, isn't every case a serious offense? Doesn't the government have an interest in every case that it prosecutes? Otherwise, why is it prosecuting? I mean, just from a philosophical standpoint, right?"

¶21    As an initial matter, we must address the circuit court's "philosophical" discussion of the first *Sell* factor. "Although the Court in *Sell* offered no guidance on how to determine the seriousness of an offense," *see United States v. Evans*, 404 F.3d 227, 237 (4th Cir. 2005), two things about the first *Sell* factor are abundantly clear to this court: (1) not all crimes are "serious" when analyzing this factor, and (2) not all crimes are considered serious merely

10

because the State has charged them. On the first point, we know this fact to be true because the United States Supreme Court could have simply said that "[t]he Government's interest in bringing to trial an individual accused of a … crime is important," but it instead specified that "the offense [must be] a serious crime against the person or a serious crime against property" in order to override the defendant's liberty interest against unwanted medication. *See Sell*, 539 U.S. at 180.

¶22 On the second point, the Supreme Court could likewise have specified that if the government has decided to charge a defendant with a crime, that crime qualifies as a serious crime. The Court, however, did not provide that guidance. The circuit court's rationale here essentially abdicates the first *Sell* factor anytime that a crime has been charged by a prosecutor, which is not the law. While we recognize the significant role that prosecutorial discretion plays in the criminal justice system, for the purpose of the first *Sell* factor, the government's interest in prosecuting a crime must be "important enough to override the defendant's liberty interest against unwanted medication." *See J.D.B.*, 419 Wis. 2d 383, ¶14.

¶23 Secondarily, we recognize that there are few cases in Wisconsin outlining or even addressing what factors a court should consider when looking at the first *Sell* factor. Our goal here is not to provide a broad pronouncement regarding what mitigating factors circuit courts must consider. Instead, the factors that we discuss below are those that we consider relevant and appropriate for consideration under the facts of these particular cases, with the intent that circuit

courts may find this discussion persuasive for future determinations under the first *Sell* factor.[6]

¶24    With this purpose in mind, we conclude, under the circumstances in these cases, that Scott was not accused of serious crimes and that the State's interest in prosecuting Scott was overridden by his liberty interest in avoiding forced medication.  *See Sell*, 539 U.S. at 180.  As the Supreme Court has instructed, the analysis under the first *Sell* factor is case-specific.  *Id.*  Based on that instruction, we have held previously "that the totality of the alleged criminal conduct may be considered when determining whether the State has an important interest in bringing a defendant to trial."  *State v. B.M.T.*, 2025 WI App 77, ¶3, 419 Wis. 2d 330, 30 N.W.3d 516.  Further, "the extent of the defendant's criminal exposure—in nature, scope, and penalty—informs the government's interest in bringing the defendant to trial."  *Id.*, ¶36.

¶25    Scott first asks us to "adopt a framework that looks to the legislature for an objective definition of 'serious crime' under *Sell*."  Citing *United States v. Berry*, 911 F.3d 354, 360 (6th Cir. 2018), he argues that a framework would "reduce the potential for arbitrariness inherent in the consideration of more subjective factors, and respect the legislature's fundamental role in determining the seriousness of a particular crime."  (Citation modified.)  He asserts that the Wisconsin Legislature has defined "serious crime" in various contexts.  *See* WIS.

_____

[6] A petition for review of our decision in *B.M.T.* is currently pending before the Wisconsin Supreme Court.  Given that there are very few cases in Wisconsin that provide guidance on how to evaluate the seriousness of an offense and given that the facts in *B.M.T.* present a much closer case, in our estimation, regarding the government's interest in prosecution, we encourage our supreme court to accept the petition for review in *B.M.T.*

STAT. §§ 48.685(1)(c), 48.686(1)(c), 50.065(1)(e)1.-2., 969.08(10)(b). According to Scott, none of his charges are listed in those legislative definitions. Likewise, Scott argues, his charge for a Class I felony does not meet the legislature's definition of "serious felony" under WIS. STAT. §§ 48.415(9m)(b), 302.11(1g)(a), 939.62(2m)(a)2m., or 973.0135(1)(b).[7]

¶26　Scott next considers that in federal courts, generally, decisions look to "the maximum statutory penalty, as it 'reflects at least some measure of legislative judgment regarding the seriousness of the crime,'" *see, e.g.*, ***United States v. Breedlove***, 756 F.3d 1036, 1041 (7th Cir. 2014), or the sentence that the defendant would likely receive under the federal sentencing guidelines, *see, e.g.*, ***United States v. Hernandez-Vasquez***, 513 F.3d 908, 918-19 (9th Cir. 2008). However, Scott argues that given the factors that circuit courts in Wisconsin must consider under ***State v. Gallion***, 2004 WI 42, ¶44, 270 Wis. 2d 535, 678 N.W.2d 197, "the statutory maximum penalty [is] a poor benchmark for measuring the strength of the state's interest in prosecution." According to Scott, regardless of the standards we apply, Wisconsin courts "should adopt stringent benchmarks to ensure that orders for involuntary medication do not become a routine exercise."

¶27　Like our supreme court, "[w]e decline [Scott's] invitation" to adopt a framework to determine whether a crime is serious. *See **J.D.B.***, 419 Wis. 2d 383, ¶22. The fact that the legislature lists none of Scott's charges as a serious crime or a serious felony is not dispositive as to the first ***Sell*** factor. *See **State v. T.A.W.**,*

---

[7] Moreover, Scott contends that his possession of methamphetamine charge is also not a "serious drug offense" under federal law. *See* 18 U.S.C. § 924(e)(2)(A).

No. 2025AP437-CR, unpublished slip op., ¶19 (WI App June 3, 2025).[8]  However, a legislative pronouncement regarding crimes it deems serious is certainly a factor we may reasonably consider, and we conclude that fact weighs against a conclusion that Scott was charged with serious crimes.

¶28    Moreover, the facts of Scott's charges, as outlined in the criminal complaints, demonstrate that Scott's crimes are not serious because they were nonviolent and were not crimes against people or property.  In Case No. 2024CM342, the complaint details that Scott caused a disturbance at a police station by "screaming at the top of his lungs and pounding on the glass window" of the reception desk "about having items stolen from him."  By the time an officer responded to the commotion, Scott "had already made it outside" and "kept walking away from [the officer] at a rapid pace."  Scott then refused to listen to law enforcement commands when the officer attempted to detain him.

¶29    According to the complaint in Case No. 2024CF838, police responded to the report of a disturbance at the CN Railroad yard based on an individual "wandering and dazed under the overpass in the middle of the yard." According to the workers at CN Railroad, Scott "had been yelling at them to stop the trains due to hearing a woman yell for help from the woods/tall brush.  They believed this male either had mental health issues or was on some drug."  In the woods, officers "found a makeshift tent with random clothing and items scattered by the tent," and they found Scott near the tent.  When the officers engaged with

---

[8] An unpublished opinion that is authored by a member of a three-judge panel, and issued on or after July 1, 2009, may be cited for its persuasive value.  WIS. STAT. RULE 809.23(3)(b).

14

Scott, he said that "he was looking for a female that was screaming in the brush," but the officers heard no screaming. The officers continued to follow Scott around, but Scott "would not stop to communicate with [them]" and "also stated that [the officers] were harassing him." Based on statements in the complaint, officers recognized that Scott was likely "having some mental health issues."

¶30 Eventually, officers decided to detain Scott based on his proximity to the moving trains, and they "grabbed onto [his] upper arm and lower arm to assist his hands behind his back," which caused Scott to tense up and "exhibit[] active resistance with his muscles extremely tight and attempt[] to get away from" the officers. Scott "eventually appeared to fall onto the ground," and "[o]nce on the ground," he was placed in handcuffs. The officers were not injured in the struggle. Scott thereafter refused, multiple times, to give officers his name. During a search of Scott's person incident to arrest, officers found "a clear plastic baggie with a crystal-like substance in it," which officers believed to be methamphetamine, and "a clear pipe with burnt residue in it."

¶31 Our conclusion that Scott's crimes are not serious is further supported when we consider the extent of Scott's "criminal exposure—in nature, scope, and penalty." *See **B.M.T.***, 419 Wis. 2d 330, ¶36. The maximum sentence for the possession of methamphetamine charge is one and one-half years' initial confinement. WIS. STAT. § 973.01(2)(b)9.; *see also* WIS. STAT. § 939.50(3)(i). Scott's other alleged crimes are all misdemeanors with maximum penalties of 30 days, 90 days, 90 days, 9 months, 9 months, and 9 months. *See* WIS. STAT. §§ 961.573(1) (possession of drug paraphernalia), 947.01(1) (disorderly conduct), 946.41(1) (resisting or obstructing an officer), 946.49(1)(a) (misdemeanor bail jumping), 939.51(3)(a)-(b) (stating the penalty for a Class A or B misdemeanor is

either imprisonment not to exceed 9 months or 90 days, respectively). The State and Scott agree that Scott's "total criminal exposure was three years and two months."[9] Particularly when we consider the nonviolent nature of the crimes charged in these cases, we do not consider these penalties, individually or collectively, to be significant enough to override Scott's liberty interest against forced medication.

¶32 The State challenges our determination here by arguing that "[t]he circuit court's conclusion [that Scott's charges were serious] is bolstered by" our decision in **B.M.T.**, where we "concluded that a different Class I felony was 'undoubtedly' a serious crime." *See* **B.M.T.**, 419 Wis. 2d 330, ¶29. We are not persuaded by the State's argument. First, **B.M.T.** does not state that *all* Class I felonies are serious crimes within the meaning of *Sell*. Further, the facts in these cases are materially different from the facts in **B.M.T.** The Class I felony at issue in **B.M.T.** was not a drug possession charge. The defendant was charged with substantial battery as an act of domestic abuse, which is a violent crime against a person. **B.M.T.**, 419 Wis. 2d 330, ¶29; WIS. STAT. § 940.60(2). Further, the defendant was charged with a "collective twenty charges, nine of which [were] felonies," which we noted "expose[d the defendant] to a total of more than 50 years' imprisonment" and "reflect[ed] an individual who [was] allegedly incapable or unwilling to conform his conduct to the requirements of the law." **B.M.T.**, 419

---

[9] We note that this calculation does not appear to include the time available for extended supervision on the Class I felony charge. If that amount is considered, we calculate the total exposure for all of the crimes to be three years and six months, when served concurrently. In the unlikely event that Scott was convicted of all of the charged offenses and the circuit court ordered the sentences to be served consecutively, Scott's total criminal exposure would be six years and four months.

Wis. 2d 330, ¶34. Thus, this court's conclusion in **B.M.T.** does not dictate a certain result here because "[t]he nature of the criminal charges and [the defendant's] significant criminal exposure weigh[ed] heavily in [that] analysis." *Id.*, ¶33.

¶33 We also conclude that the State cannot establish a sufficiently important interest in prosecuting Scott because the specific facts of these cases sufficiently "diminish the strength of the interest such that it is no longer important enough to warrant forcible medication." *See J.D.B.*, 419 Wis. 2d 383, ¶¶12-14, 21; *Sell*, 539 U.S. at 180. Here, the State's interest in prosecuting Scott is mitigated by his lengthy pretrial confinement as well as the nonviolent nature of his alleged crimes and his mental health history and condition.

¶34 First, Scott was never released from custody after his arrest on May 4, 2024. Therefore, Scott asserts, and the State does not dispute, that he was entitled to 276 days of sentence credit, which with good time credit under WIS. STAT. § 302.43, "substantially exceeded the statutory maximum penalty for all charges except the possession of methamphetamine" charge. Our supreme court has explained that "the state's interest could … be lessened if a defendant has already served a lengthy confinement for which he [or she] will receive significant credit toward any ultimate sentence resulting from the prosecution." *J.D.B.*, 419 Wis. 2d 383, ¶13 (citing *Sell*, 539 U.S. at 180); *see also J.D.B.*, 419 Wis. 2d 383, ¶28 (noting that defendant's eight-month pretrial custody would have "a mitigating effect on the State's interest because some of the penological goals of criminal prosecution will have been accomplished already"); *Berry*, 911 F.3d at 363 ("[A] lengthy pre-trial confinement (especially when coupled with a relatively short potential sentence) reduces or eliminates the amount of time a criminal

17

defendant could potentially face."). Accordingly, we agree that Scott's pretrial confinement serves as a mitigating factor in these cases.

¶35 Further, the State's interest in prosecution is mitigated by the nonviolent nature of Scott's alleged crimes, as outlined above. *See Berry*, 911 F.3d at 364 (holding that the "non-violent nature of" the defendant's false bomb threat "militates against there being an important government interest under the *Sell* framework"). While Scott arguably posed some danger to himself based on his delusions about a screaming woman and his proximity to the train tracks, he did not violently engage with law enforcement or the workers at the CN Railway yard; he did not brandish a weapon; and he did not cause damage to any property. In addition, Scott has a well-documented mental illness; the complaints acknowledge that he was known to be homeless; and his delusions were leading him to attempt to help a woman rather than harm or scare anyone. *See United States v. Ruiz-Gaxiola*, 623 F.3d 684, 695 (9th Cir. 2010) (speculating that "[i]t seems reasonable to conclude from the record that [the defendant] was inclined to commit this offense at least in part by his mental condition" and that the fact that "the offense was the result of a mental disorder of this type might well render it less important that the government prosecute the particular defendant").

¶36 In terms of the possession of methamphetamine charge, the State asserts that the circuit court was correct to conclude that the charge was serious because, "[a]s the circuit court noted, methamphetamine is one of the most addictive drugs on the streets, and the impacts it has on both society and the user make it 'very serious.'" Thus, the State argues that it "has an obligation to protect communities and users from the effects of methamphetamine."

¶37    We do not dispute, in general, the circuit court's statement that methamphetamine use is a serious danger to the community because of the effects it has on the user and the other crimes it propagates, nor do we quarrel with our supreme court's statement "that criminal prosecution serves interests far beyond [Scott] himself." *See **J.D.B.**,* 419 Wis. 2d 383, ¶28.  Nevertheless, the Supreme Court in **Sell** was abundantly clear that "[c]ourts … must consider the facts of the individual case in evaluating the Government's interest in prosecution." **Sell**, 539 U.S. at 180.

¶38  Considering the individual facts here, Scott's use of methamphetamine is itself the result of a longstanding delusion caused by his mental illness, such that he believes he is appropriately medicating himself.[10] Therefore, the societal impact of addiction and methamphetamine use *generally* are not necessarily appropriate considerations in an individualized analysis where, as here, the addiction is due to mental illness and is specifically a result of the individual's delusions; where Scott is not accused of distributing the drugs to others; and where there is little adverse impact of the methamphetamine use on

---

[10] As noted above, Janis outlined in her report that Scott "has repeatedly stated that he is prescribed methamphetamine … by [an] outpatient psychiatrist," that he "fills these prescriptions at Walgreens and is 'authorized by the state' to possess methamphetamine," and that "he is required to take methamphetamine … 'for flight aviation.'"  Thus, she agreed that Scott's belief that he has a prescription for methamphetamine has "been a longstanding fixed delusion."

others—or, in other words, arguably the impact is indistinguishable from the impact of the mental illness itself—under the circumstances as they exist here.[11]

¶39 In conclusion, Scott has not been charged in these cases with serious crimes, as contemplated by *Sell*. Further, the combination of special circumstances—such as Scott's significant pretrial confinement, the nonviolent nature of Scott's charges, and the relation of Scott's mental health to his crimes—also has a mitigating effect that serves to eliminate the State's important interest in prosecuting Scott for his crimes. Therefore, under the facts of these particular

---

[11] Based on the *Sell* Court's statement that "[t]he potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution," *Sell*, 539 U.S. at 180, Scott also argues that there is a high likelihood of him being committed under WIS. STAT. ch. 51. According to Janis, Scott has been "admitted … for competency treatment" or "treated for competency" on numerous occasions since 1996; however, it is unclear to this court whether Scott has actually been subject to a ch. 51 civil commitment in the past. In his brief-in-chief, Scott merely refers to "repeated competency commitments in 2016, 2021, and 2024," suggesting, based on evidence in the record, that he is referring to competency proceedings under WIS. STAT. § 971.14. Scott further states that he "is mentally ill, a proper subject for treatment, and a danger to himself—all of which are required for commitment under Chapter 51." *See Langlade County v. D.J.W.*, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277.

We conclude that Scott's arguments with regard to a possible future WIS. STAT. ch. 51 commitment are speculative. While a future ch. 51 commitment may be a proper factor to consider when evaluating the governmental interest in prosecuting a defendant, in these cases it does not mitigate the State's interest. Scott postulates only that he might be civilly committed under ch. 51 because he allegedly meets the criteria; however, like the defendant in *J.D.B.*, no ch. 51 commitment proceedings had commenced for Scott at the time of the circuit court's orders in these cases and, as far as we are aware, Scott had never been found dangerous or committed under ch. 51 in the past. *See J.D.B.*, 419 Wis. 2d 383, ¶27.

To the extent that Scott is arguing that there was a possibility that he would be subject to commitment under WIS. STAT. § 971.14 again in the future, we see no reason that possibility would impact the State's interest in prosecuting Scott in these cases. Therefore, "the mere possibility that [Scott] may have faced a future commitment at the time the circuit court made its decision does little to undermine the State's interest in prosecuting" Scott. *See J.D.B.*, 419 Wis. 2d 383, ¶27.

20

cases, the first *Sell* factor has not been satisfied. Accordingly, we reverse the circuit court's orders for involuntary administration of medication.

*By the Court.*—Orders reversed.

Not recommended for publication in the official reports.